**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

IN RE:

**RIO PIEDRAS EXPLOSION LITIGATION**             Civil No. 96-2443 (CCC)

## MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION

On September 17, 1999, the Plaintiffs' Steering Committee ("PSC") filed a motion asking the Court to fix the percentage of settlement proceeds to be deducted for payment of PSC attorneys' fees and costs (**Docket No. 1594**). This matter was subsequently (October 1999) assigned to the undersigned Magistrate-Judge, who conducted evidentiary hearings on December 16, 1999 (**Docket No. 1755**), and January 12, 2000 (**Docket No. 1765**). Based upon the information provided at the evidentiary hearings by the PSC, the Individually Retained Plaintiffs' Attorneys ("IRPAs"), and the San Juan Gas Defendants, as well as the documentary evidence contained in the record, the undersigned hereby **RECOMMENDS** that the PSC be entitled to attorneys fees funded by one-third of the privately agreed contingency fee contract between each attorney involved in this litigation and his or her client. In addition, this Court **RECOMMENDS** that five percent (5%) of the total fee award be set aside to cover the costs incurred by the PSC in litigating this case.

I.      **Procedural Background**

On September 17, 2000, the Plaintiffs' Steering Committee (PSC)[1] requested the Court to fix the percentage of settlement proceeds to be deducted for payment of the PSC attorneys' fees and costs (**Docket No. 1594**). Arguments and evidence in regards to the PSC's request

---

[1] The PSC is composed of twelve members: Jorge Ortiz-Brunet, Francisco Bruno, Alvaro Calderón, Andrés Guillemard-Noble, Jorge M. Izquierdo-San Miguel, Steven C. Lausell, Francisco M. Troncoso, Renato Barrios-Maldonado, José Hernández-Mayoral, Benjamín Ortiz-Belaval, Freddie Pérez-González and Pedro Saade-Lloréns.

at the evidentiary hearings held on the issue in December 1999 and January 2000[2] (**Docket Nos. 1755, 1765**). Thereafter, the PSC was requested to submit detailed information regarding the hours worked by each member of the PSC and data regarding administration and litigation costs (**Docket No. 1674**).[3] The IRPAs were also requested to attend the evidentiary hearings, express their posture regarding the issue at hand and submit, in writing, any additional information that would enable the court to determine the type and amount of work they have carried out (**Docket No. 1661**). At the hearing, information regarding the contractual/professional agreements was received from approximately 30 IRPAs. The PSC also provided contingency fee information to the Court (**Docket No. 1674**, Exhibits 1 to 4 submitted at the evidentiary hearing). Additionally, a similar number of IRPAs filed contingency contractual information with the Court. A copy of a resolution issued by the Commonwealth Superior Court, San Juan that partially addressed the issue of attorneys fees at the local level was also submitted. (*See* **Docket Entries 1668 through 1738**).

The record also reflects that the San Juan Gas defendants[4] filed a "Motion for Escrow Account" (**Docket No. 1706**) in which it was reported they were ready to deposit, as result of settlement negotiations, "ten percent (10%) of the gross amount of each settlement." In essence,

---

[2]The January 2000 hearing was attended by 34 of the approximately 85 attorneys participating in the litigation, among them the members of the PSC.

[3]The most recent financial data submitted by the PSC is that within PSC's Cash Receipt and Disbursement Statements for the period of August 1997 through October 2000 (**Docket No. 3095 and 3096**).

[4]The San Juan Gas Company, Inc., Enron Corp., Enron Liquid Services Corp., Enron Engineering and Construction. Co.; Enron Americas, Inc. and Enron Operations Corp. are collectively known as the "San Juan Gas" defendants.

the defendants wanted to leave said funds deposited and then at a future date, have the plaintiffs and the Court determine the manner in which said funds were to be distributed.

Related to the PSC attorneys' fees issue as well are filings under **Docket Nos. 1603 and 1610** – a motion requesting the court to authorize individual plaintiff's counsel and defendants to proceed with settlement or for a hearing and an opportunity to respond thereto. In essence, the PSC continued to request that no settlement payments be disbursed until the percentage of the PSC attorneys' fees was fixed and a procedure for reimbursement of costs determined.

Initially the PSC had suggested that the percentage of attorneys' fees and reimbursement of costs were to be paid from the gross amount of settlement payments. Consistently, at the evidentiary hearings the possibility of having a 10% and a 5% fixed amount (of the gross settlement) for attorneys' fees and costs, respectively, was requested. The IRPAs in essence opposed said request and argued their inability to assess the real impact of such determination inasmuch as at the time only less than 1% of the cases had been settled (13 cases of a total of 250 cases).[5] The IRPAs further argued that the formula suggested by the PSC did not consider the specific terms or fee agreement between each IRPA and his/her client (**Docket No. 1760**).

The record reflects that there are approximately 85 attorneys of record although of these 64 are lead counsel while the others are co-counsels joined in the representation of one or more defendants.[6] Of the total number of IRPAs less than 30 attorneys participated at the evidentiary hearings or filed responses in compliance with this Magistrate-Judge's Order providing IRPAs

---

[5]Statistics available to the Clerk of Court as of June 14, 2001, reflected that a total of 269 cases were consolidated under Civil No. 96-2443(CCC). Of these, 91 had settled and there were 178 pending with on-going settlement negotiations.

[6]According to the PSC the record actually reflects 85 attorneys of record, but the number in excess of 64 consists of those attorneys co-representing the same plaintiffs in the same individual case. (Sealed Document).

with an opportunity to state their posture regarding the PSC's request for payment of attorneys'

fees and costs.

## II.    Relevant Facts

On November 21, 1996, a tragic explosion occurred at a commercial establishment

located at the Humberto Vidal Building in Río Piedras, San Juan, Puerto Rico.   As a result,

thirty-three persons were killed, and dozens of others were physically injured and the

properties of several others were totally destroyed or partially damaged. Subsequently, over

one hundred complaints were filed in this Court.    All of those complaints have been

consolidated under the above-captioned case (**Docket No. 11**).

Hundreds of plaintiffs have appeared represented by dozens of individually retained

attorneys (IRPAs).  The record reflects that there are at least 64 "attorneys of record."  To

enable the efficient administration of all cases and actions, on April 17, 1997, the District Court

issued an Order appointing certain plaintiffs' lawyers to a "Plaintiffs' Steering Committee"

("PSC")[7] (**Docket No. 91**).  In its Order, the court further determined the PSC's authority and

obligations.  Among these it was specified that the PSC was to act as lead counsel in all cases,

design the discovery and trial strategy,  participate at all court hearings, address legal issues

raised, take depositions, contract experts within different fields of expertise and pursue all

settlement options on behalf of all individual plaintiffs. *Id.*  More so, the PSC was empowered

with the authority to rent office space, purchase office equipment, maintain central offices,

---

[7]The Court on February 7, 1997 had initially appointed an Interim Plaintiffs' Steering Committee. The permanent designation of its members was made on April 17, 2000. Initially the PSC was composed of seven (7) members.  Thereafter, at the PSC's request the number was enlarged and the lead attorneys in charge of the related court cases filed before the Commonwealth courts were admitted as formal and permanent members of the PSC.  This committee, now composed of twelve (12) members, is the one herein designated as the PSC.

archives and warehouse and develop an administrative and operational system allowing for the different management of cases, record keeping, the IRPA participation and keeping the IRPAs informed of all developments within the case. *Id.* Members of the PSC were also responsible for calling meetings with or demanding information from IRPAs, preparing and maintaining adequate files of all pre-trial matters and having them available for examination by IRPAs. *Id.* Additionally, the PSC could negotiate and enter into stipulations with defendants regarding the liability and damages issues. *Id.* Quarterly status reports summarizing the PSC's work and progress had to be prepared and notified to the IRPAs which, in turn, were granted time in which to object, submit clarifications or demand additional information from the PSC. *Id.*

In creating the PSC the court also recognized that the complex nature of the litigation entailed for substantial expenditures of monies throughout all stages. Based on the strategy and procedure followed in other mass disaster litigations, the PSC was instructed to create an expense fund which was to be generated through assessments imposed upon plaintiff's attorneys. Accordingly, assessments were made upon the PSC members, in their official capacity and upon the individual plaintiffs' counsel, which includes as well PSC members (as IRPAs). Therefore, each PSC member was to contribute a "membership fee" of $50,000 in addition to any other applicable assessment based on the nature of type of action in which each member participated. *Id.* More so, each attorney prosecuting a wrongful death action was to contribute $1,000 for each decedent named and those representing injured persons were to contribute $500 for each injured plaintiff named in the complaint. *Id.*

The PSC was authorized to expend monies periodically from the funds to defray the necessary "hard"[8] and "soft"[9] costs of its work. All plaintiffs and PSC members were instructed to keep detailed records of their expenses and were admonished that "only reasonable and necessary expenses" were to be reimbursed.

In regards to any possible settlement, in the April 17, 1997 Order, the presiding District Judge stated in relevant part as follows:

> Once any settlement approved by the Court is finalized, a percentage amount (to be determined later but probably less than 10%) of the gross settlement amount[10] will be ordered deposited into a special account and will be used to pay [Plaintiff's Steering] Committee members a fee for their services as well as to reimburse the [Plaintiffs' Steering] Committee for authorized expenditures.
> . . .

**(Docket No. 91)**

Following the issuance of this order, the PSC performed its designated duties. These included renting an office, as well as purchasing necessary equipment and hiring essential office staff (Sealed Document; **Docket No. 1770**, p. 10). The PSC also hired experts in such diverse fields as methane gas, propane gas, soil, and pipes, meeting with them for hundreds of hours (Sealed Document; **Docket No. 1770**, p. 11). The PSC filed more than 221 motions[11],

---

[8]Hard costs are to include among others, office overhead, staff salaries, warehousing, duplication, expert fees, deposition costs, etc.

[9]Soft costs are to include among others, expenses related to travel, meals, transportation, lodging, etc.

[10]We interpret the phrase "gross settlement amount" to refer to the total of all fees awarded to the attorneys (both PSC members and IRPAs) in this case.

[11]The filing of one particular motion seeking alleged privileged documents within defendants' control and possession, which the Court reportedly granted, led to resolution of the liability issue in the case as the defendants indicated they would rather pay a settlement amount than produce the documents at issue (**Docket No. 1770**, pp. 22-23).

prepared interrogatories, and responded to numerous defense motions (Sealed Document; **Docket No. 1770**, pp. 12, 22, 24). In addition, members of the PSC took more than 228 depositions, some of which lasted for several days, and many of which were conducted outside Puerto Rico (Sealed Document; **Docket No. 1770**, p. 12). For example, for some six months every working day from Monday to Friday of each week was devoted to depositions (**Docket No. 1770**, pp. 19-20). PSC members examined more than 200,000 pieces of evidence, which included photographs, blueprints, diagrams, and voluminous expert reports (Sealed Document; **Docket No. 1770**, pp. 13, 19, 25). PSC members attended status hearings in this Court, and filed status reports pertaining thereto (Sealed Document; **Docket No. 1770**, p. 13). The Committee also held 31 regular meetings with the IRPAs (*Id.*). In sum, PSC members expended thousands of hours working on this case, developed the investigative and trial strategy, hired the necessary and best qualified experts in each field and have, undoubtedly, provided high-quality legal representation. As a result of their efforts, the defendants determined not to contest liability and without the need of a bifurcated trial, the matter now has proceeded to the damages phase (**Docket No. 1770**, p. 18).

While the PSC members performed the above tasks, the IRPAs also performed various tasks. These tasks included holding initial meetings with their prospective clients, drafting the initial complaint and amending same, serving process on the defendants, obtaining preliminary documentary evidence, meeting and interviewing witnesses, responding to discovery, conducting periodic status meetings with plaintiffs, making court appearances when necessary, communicating with the PSC, meeting with expert witnesses, accompanying clients to depositions, responding to damage questionnaires, providing assistance as necessary to PSC personnel and proving specific information on each plaintiff's damages (Pls.' Compliance with

Nov. 4, 1999 Order; **Docket No. 1770**, pp. 74, 78; **Docket No. 1769,** pp. 32, 34, 44). IRPAs

are also attending settlement conferences and if their individual cases are not settled, they will

also be responsible for any subsequent litigation on the issue of damages (**Docket No. 1770**,

p. 44).

PSC members have indicated that with very few exceptions, there has been significant

lack of participation by the IRPAs (**Docket No. 1770**, p. 46).    While many IRPAs fully

cooperated in the litigation process, approximately 30% failed to respond or cooperate. Indeed

the January hearing was delayed for one-half hour as only four IRPAs had appeared in order

to participate at the hearing.   Hence, this Magistrate-Judge granted a short delay so that more

IRPAs could be located to attend the hearing (**Docket No. 1769**, p. 2).   In spite of the

opportunity provided for the IRPAs to respond in writing and assert their particular positions

or to react to the PSC assertions, as presented at the hearings, only some 34 attorneys

participated at the hearing.   Of those, 6 were members of the PSC and only 28 were IRPAs.   At

a subsequent meeting that was held at the PSC's offices in order to allow IRPAs with further

access to the PSC accounting records, a low percentage of participation was reported by the

IRPAs.

The PSC members represent 69% of the plaintiffs in this action cases while the IPRAs

represent the remaining 31% of the plaintiffs (**Docket No. 1769**, p. 8).   However, the IRPAs

represent 90% of the lawyers involved in this litigation. *Id.* At the hearing the IRPAs

acknowledged that 90% of the lawyers had benefitted in 30% of the work and recognized that

the PSC should be especially compensated. *Id.* The IRPAs pointed out, however, that 90% of

the lawyers have worked in the second part of these cases, that is in gathering the evidence that

establishes the existence of damages. *Id.*

In September of 1999, as a result of the PSC's efforts and litigation strategy, the San

Juan Gas Defendants began entering into settlement agreements with individual plaintiffs in

this case (**Docket No. 1603**).  However, as of the date of the evidentiary hearings, no payments

have yet been made because of the outstanding issue regarding payments to be made to the

PSC.  The total amount of monies spent on expenses as of September 30, 1999, in prosecuting

these cases totaled $1,769,448.50 of which $988,154, that is 55.8%, was used to pay expert

witness fees. As of the date of the December 1999 hearing, the PSC had spent over $2,100,000

to litigate the case.[12]   The IRPAs and PSC met following the December hearing in order to

examine the PSC account statements.  A consensus was reached that the IRPAs "trusted" the

accounts of expenses presented by the PSC (**Docket No. 1769**, p. 4).   While some IRPAs may

disagree on where the percentage will be deducted from, they agree to the proposed 5%

deduction of the settlement amounts to cover the PSC's expenses.  *Id.*

## III.   Conclusions of Law

### A.  Contingency Fee Contracts

The undersigned first turns to the issue of contingent fee contracts.  It must be initially

noted that the IRPAs were originally retained under a variety of contingent-fee agreements,

some of which plaintiffs agreed to pay certain costs and expenses.

The District Court has broad equitable powers to supervise the collection of attorney fees

and monitor contingency fee agreements. *In re San Juan DuPont Plaza Hotel Fire Litigation,*

768 F.Supp. 912, 920 (D.P.R. 1995), *vacated on other grounds, citing Dunn v. H.K. Porter*

---

[12]The PSC reported that as of September 9, 1999, the following expenses had been incurred: litigation support - $1,278,386; salaries and payroll taxes - $134,669; rent and utilities - $89,479; office supplies - $49,989; other professional services - $43,209; capital expenditures - $24,504; other expenses - $105,088.

*Co.*, 602 F.2d 1105 (3rd Cir. 1979); *Cappel v. Adams*, 434 F.2d 1278 (5th Cir. 1970). A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of a court, as to its reasonableness. *In re San Juan DuPont Plaza Hotel Fire Litigation,* 768 F.Supp. at 920. "Even when an attorney can show that a client signed a contingency fee agreement, '[the] court is not required to give 'blind deference' to contractual fee agreements and must ultimately be responsible for fixing a reasonable fee for the judicial phase of the proceedings.'" *Id.   quoting Ramos-Colón v. Secretary of Health & Human Services*, 850 F.2d 24, 26 (1st Cir. 1988).

Moreover, it is indisputable that district courts have the inherent power to supervise and manage the disbursement of attorney fees from settlement awards. *Id. citing Dunn v. H.K. Porter Co.*, 602 F.2d at 1109. When fee awards are to be paid from settlement funds, the Court has an independent duty to scrutinize the reasonableness of contingency fee contracts. *Id. citing Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982); *Hoffert v. General Motors Corp.*, 656 F.2d 161, 165 (5th Cir. 1981). If the Court finds that a fee agreement provides for an unethically excessive fee, it may sparingly exercise its supervisory powers to limit the amount an attorney may actually receive. *Sargeant v. Sharp*, 579 F.2d 645, 648 (1st Cir. 1978).

The IRPAs have presented written findings highlighting generally the percentage of fees agreed upon with their clients (**Docket Entries 1668 through 1738**). Additionally, during the evidentiary hearings, testimony was presented and exhibits admitted regarding the contingency contracts entered into between some of the plaintiffs and their respective attorneys. Additionally, some of the IRPAs filed with the court copies of their contingency fee contracts.

Upon reviewing those contracts, it was clear that some of the contracts provided for contingent fees ranging from 20% to 33% for minors and incompetents[13] and 20% to 40%[14] for adults.

Pursuant to its inherent powers and in light of state law and the facts surrounding this case, the undersigned **RECOMMENDS** the automatic modification of those contingency fee contracts which exceed twenty-five percent (25%) for each minor and incompetent plaintiff and which exceed thirty-three percent (33%) for each adult plaintiff to 25% and 33%, respectively, in this case. These percentages are the maximum award counsel can recover for their fees[15]. **IT IS FURTHER RECOMMENDED** that counsel who are parties to contracts providing for higher fee percentages file petitions showing good cause as to why the terms should not be modified by the Court.

### B. Attorney Fees

The undersigned now considers the issue of how the attorney's fees for the PSC members are to be determined. There are several methodologies employed in structuring an award of attorneys' fees.  Basically two methods are employed – the percentage of the fund

---

[13]*See* **Docket No. 1683** which reflected a 33.3% fee in the cases of three minor co-plaintiffs.

[14]From those attorneys who reported what his/her attorneys fees were or provided copy of the attorneys fees contract, in only one (1) instance a 40% is to be charged "after commencement of lawsuit." (*See* **Docket Nos. 1688 and 1689**). Among this group of attorneys, four (4) failed to provide information regarding the percentage of attorneys fees they had agreed upon (**Docket Nos. 1682, 1691-1692, 1732-1733 and 1735**).

[15]The Commonwealth of Puerto Rico prohibits an attorney from charging contingency fees for services rendered in excess of twenty-five percent (25%) of the award received by a minor or mentally disabled client and thirty-three percent (33%) of the award received by every other client. Where good cause is shown, the Court has the discretion to allow up to a thirty-three percent (33%) contingency fee of the final proceeds received by a minor or mentally disabled client. See P.R. Laws Ann. tit. 4, § 742.

(POF)[16] and the lodestar method.[17]  The district court has the discretion to use whichever method best fits the individual case.  *In re Thirteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation*, 56 F.3d 295, 308 (1st Cir. 1995).  That discretion may involve using a combination of both methods when appropriate. *Id. citing U. S. v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 15 (1st Cir. 1988).  The POF method is the prevailing method employed in common fund cases[18] and has distinct advantages when it comes to common fund cases.  *Id.* at 307.  First, the POF method is less burdensome to administer than the lodestar method.  *Id.* at 307 *citing Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993).  More particularly, the judge is not forced to review the time records of a multitude of attorneys to determine the necessity and reasonableness of each hour expended.  *Id.*  Indeed, "while the time logged is still relevant . . . time records tend to illuminate the attorneys' role in the creation of the fund, and thus inform the court's inquiry into the reasonableness of a particular percentage." *Id.*  Second, the POF enhances efficiency, contrary to the lodestar fund which encourages lawyers to expend excessive hours and provides no incentive for early settlement.  *Id.*  Third, the POF method is result-oriented rather than process-oriented as it better approximates the workings of the marketplace in that it pays not for the individual hours

---

[16]Under the POF method "the court shapes the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those benefitted by the litigation." *In Re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation*,56 F.3d 295, 305 (1st Cir. 1995).

[17]Under the lodestar method the court determines the number of hours productively spent on the litigation and multiplies those hours by a reasonable hourly rate.  *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295, 305 (1st Cir. 1995).

[18]A "common fund case" is a case in which "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *accord, In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295, 304 (1st Cir. 1995).

worked but for the ensemble of services rendered. *Id. citing In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

From the record, it appears that the District Court intended to compensate PSC members under a percentage approach. Indeed, the Order states, that "a percentage amount (to be determined later but probably less than 10%) of the gross settlement amount will be ordered deposited into a special account and will be used to pay Committee members a fee for their services as well as to reimburse the Committee for authorized expenditures" (**Docket No. 91**). It is precisely this statement in which many IRPAs base their objections to the PSC's request.

The PSC now asks that 10% of the amounts awarded to plaintiffs be assigned as their fees as members of the PSC. They also ask that 5% of any total award given to plaintiffs be placed in an account for payment of costs and fees. The IRPAs object to the position of the PSC as to attorney fees on the bases that: 1) the PSC members will be doubly compensated for serving on the PSC and as IRPAs; 2) the Court previously indicated that the compensation amount to cover attorneys fees and expenses to the PSC would be less than 10% of the gross settlement amount; 3) because is was not necessary for this case to go to trial, any award of 10% or more of the gross settlement amount as compensation for the PSC members is unreasonable; and, 4) retaining 10% or less from the top in order to satisfy for attorneys fees fails to take into account the specific terms of fee agreements between each individually retained plaintiff's attorney and his or her clients.

The IRPAs raise the issue of dual compensation and argue that attorneys who serve on the PSC and who represent individual plaintiffs will receive more compensation than they are entitled to. However, as this District has previously noted in mass litigation cases, "it is

important to note that the plaintiffs will not be billed doubly for the legal services received from

the PSC and individual plaintiffs' counsel.  Instead, the Court will allocate a portion of the

attorney fees generated by each retained counsel for payment of PSC's attorney fees." *In re San*

*Juan DuPont Plaza Hotel Fire Litigation*, 768 F.Supp. at 929.  This Court also noted that "in

addition, the PSC's attorney fees will be allocated from the entire pool of funds generated by

all contingency fee contracts entered into by claimants in this litigation. . . ." *Id.*  Moreover,

> [a]ll counsel and their clients benefitted equally from the services
> of the PSC and all should share in the cost. The mere fact that an
> individual plaintiffs' counsel is also a PSC member is hardly
> enough to support the argument that only non-PSC members
> should be responsible for the total amount of attorney fees to be
> paid to the PSC for their services.

*In re San Juan Dupont Plaza Hotel Fire Litigation*, 768 F.Supp. at 929.

The undersigned rejects the IRPAs' contention that PSC members will receive double

compensation.  The  attorney fees will be allocated from the entire pool of funds generated by

all contingency fee contracts entered into by the plaintiffs. As a result, PSC members who have

contingency fee contracts will contribute to the fund in the same manner as the IRPAs.  The

only difference is that the PSC members will receive attorneys fees as a result of their work in

this mass litigation case.

The IRPAs also argue that the District Court had capped the amount of the PSC's

attorneys fees and related expenses to an amount less than 10%, inasmuch as the April 18,

1997 Order states that "a percentage amount (to be determined later but probably less than

10%) of the gross settlement amount will be used to pay Committee members a fee for their

services and authorized expenditures."  Upon reviewing the applicable case law, in which

similar statements and recommendations have been made at the initial stages of massive

litigation cases, and in reviewing the evidence on record at the time the Order creating the PSC

was issued, the Court's statement, more than a conclusion, appears to constitute a suggestion and makes no definitive statement that the fees and expenses will strictly be less than ten percent of the total settlement. Furthermore, it must be considered that the First Circuit has ruled that this suggestion does "not bind the district court to a ten percent cap." *In re Nineteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation*, 982 F.2d 603, 612 (1st Cir. 1992). Moreover, in this case the performance of the PSC was exemplary and the Court can "[shape] the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those who benefitted by the litigation. *In re Thirteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation,* 56 F.3d at 305.

As previously described in "Section II: Relevant Facts," the attorneys who served on the PSC performed exemplary work. This work included setting up an office, hiring and meeting with experts, filing motions and responding to defense motions, taking depositions, examining evidence, advocating plaintiffs' position in court hearings, holding meetings with the IRPAs and spending countless hours to resolve this litigation. Additionally, it appears that PSC's dogged determination in pursuing discovery strongly objected to by defendants as privileged, resulted in an early settlement of the litigation on the liability issue. Once the Court granted plaintiffs' motion to compel and defendants were faced with the threat of contempt for failure to turn over documents deemed confidential and privileged, the defendants determined to concede the issue of liability which, in turn, entails defendants' open stand to consider settlement demands. The Court has no doubt that the turn of events with this particular discovery lead to an early settlement of this matter. Moreover, the duties performed by the PSC were particularly onerous in light of the complex nature of the litigation, the large number of plaintiffs, and the abundance of evidence. Despite the difficult nature of their work which frequently entailed the

IRPAs' lack or minimum of cooperation, the PSC was able to obtain a favorable outcome on the issue of liability, event that is crucial to the IRPAs and their cases. Indeed, the PSC was able to obtain a settlement judge and a settlement fund which eliminated the necessity for a lengthy, costly trial on the issue of liability. Therefore, the undersigned rejects the IRPAs argument that because the issue of liability was settled, that any award of 10% or more of the gross settlement amount as compensation for the PSC is unreasonable

Finally, the IRPAs argue that were the PSC's request to be granted, those attorneys who entered into contingency fee arrangements for less than the 33% maximum allowed under Puerto Rico law will be unfairly penalized. The IRPAs explain that if 10% is retained for the PSC attorney's fee fund from the total settlement amount, a 33% contingent fee agreement by the IRPAs would pay 30% towards the 10% amount; a 25% contingent fee agreement by the IRPAs would pay 40% towards the 10% amount; and, a 20% contingent fee agreement by the IRPAs would pay 50% towards the 10% amount. Accordingly, the IRPAs request that the PSC attorney's fee fund be paid a maximum of 30% of the IRPAs' fees in those cases in which the contingent fee agreement of the IRPA did not agree to the maximum allowed under Puerto Rico Law.[19] The IRPAs also moved the court asking that the PSC fees be based on a percentage of the IRPAs attorneys fees as based on each contingent fee contract and not on a set percentage of the settlement monies or awards (**Docket No. 2023;** *see also* **Docket No. 1769**, p. 6; **Docket No. 1770**, pp. 50, 79, 87). The IRPAs' motions remain unopposed by the PSC.

---

[19]Upon receiving that information provided by the IRPAs (including PSC members) regarding their attorneys fee agreements, it is considered that the IRPAs' argument is a valid one. The data available indicates there are 24 attorneys who represent approximately 152 individuals who had stipulated to a 30% to 33.33% for attorneys fees. This figure and the percentage of their contribution differs in a significant way to a larger percentage or contribution to be made by 4 attorneys who had agreed to a 25/% attorneys fee rate with 229 individuals.

However, at the January hearing the IRPAs advised the Court that an agreement could not be reach as to the method used to determine the percentage amount for PSC attorney fees (**Docket No. 1769**, p. 5). Further, at the January hearing the IRPAs proposed that attorneys fees for the PSC consist of 15% of the amount of attorneys fees awarded to all attorneys from all the cases, not a percentage of the total settlement amount (**Docket No. 1769**, pp. 9-10). At the January hearing the PSC counter-proposed that for those attorneys who have individual contracts of 30% or more, the Court could allow the PSC attorney fee to amount to 10% from the total settlement amount and for those contingency fee contracts under 30%, the PSC attorney fee could be fixed at one-third of the attorney fee received by the individual attorney (**Docket No. 1769**, p. 20). Additionally, one member of the PSC at the December hearing agreed that it may be fairer in those cases that have a fee agreement for less than 33% to extract a percentage of the IRPAs' fee, suggesting one-third as reasonable (**Docket No. 1770**, p. 88).

With this factual scenario, we once again turn to assess and evaluate the work performed by the IRPAs and PSC members. At risk of being redundant, the attorneys on the PSC performed their legal functions in an admirable manner. However, it is not disputed that the IRPAs were also required to perform certain duties, such as counseling their clients, keeping their clients informed of the proceedings, responding to damage questionnaires, meeting with the PSC and negotiating settlement. With regard to IRPAs, the First Circuit has recognized that "[despite their lack of visibility . . ., the mundane chores incident to client representation are particularly critical in a mass tort common fund case." *In re Thirteen Appeals Arising Out of the SanJuan DuPont Plaza Hotel Fire Litigation*, 56 F.3d at 310. Further, the undersigned acknowledges that the IRPAs must attend settlement conferences to resolve the damages issue and if no settlement results must try the issue of damages. The undersigned also considers

that a number of IRPAs' participation was negligible.   Regardless, the IRPAs' overall participation in this litigation is taken into consideration by the undersigned as is the work performed by the PSC.[20]

After considering the arguments of the IRPAs and taking into consideration that approximately 69% of the plaintiffs to this action are represented by PSC members, while the remaining 31% of the plaintiffs are represented by IRPAs, the undersigned finds that the most equitable manner in which to resolve the PSC attorney fee issue is to base the PSC fee fund on the percentage of fees agreed upon between each attorney (IRPAs) and his or her client.[21] Utilizing this method means a reduction to the PSC attorney fee fund only in those cases wherein the contingency fee contracts are for less than 33%.  The majority of the contingency fee contracts are for 33% and as a result those cases will produce the same amount as 10% of the total settlement award originally suggested by the PSC.  The undersigned also considers that in many cases the lesser percentage contingency contracts were entered into on behalf of minors and/or incompetents or in cases where all or most plaintiffs do share similar cause of action and damages.  Based on the duties performed by the PSC and the resulting settlement on the issue of liability it achieved, it is therefore **RECOMMENDED** that the PSC attorney's fees be funded by one-third (33.33%) of the privately agreed contingent fee contracts between each attorney and his or her client.  For example, a contingency fee contract for 25% and a $200,000 settlement award would result in $50,000 attorney's fees with one-third (33.33%) of $50,000

---

[20]The PSC as of September 1999 had reported a total of 19,272.5 hours devoted to those tasks assigned by the Court.  On such date, the loan from PSC members exceeded $1,000,000 and had had cash disbursements of over $1.7 million of which approximately 72.2% was assigned to professional fees/litigation support (Exhibit I).

[21]The attorneys fees awarded to the PSC members will be funded by attorneys fees from both PSC members and IRPAs.

used to fund the PSC attorney's fee fund. The fund would receive $16,665. This amount is well within the limits allowed in cases of this type. Moreover, the undersigned considered the First Circuit's statement that "[a]lthough we do not impose an absolute ceiling on lead counsel fees in fees in common fund mass tort cases, cases in which a court should excess 50% are likely to be hen's-teeth rare." *In Re Thirteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation*, 56 F.3d 295, 312 n. 16 (1st Cir. 1995). The undersigned finds this reasonable compensation in light of work undertaken by IRPAs and PSC members in this mass tort litigation.

With regard to the State Insurance Fund Corporation and the Integrand Assurance Company, the undersigned **RECOMMENDS** that no percentage be assigned to their attorneys fees. The undersigned makes this recommendation inasmuch as neither in-house counsel for Integrand Assurance Company nor the State Insurance Fund Corporation are charging attorneys fees (**Docket No. 1769**, pp. 18-19). Rather, they are seeking subrogation. Consequently, they are not representing injured plaintiffs. To assign a percentage of attorney fees to these two entities would result in a doubling of attorneys fees to the PSC.

Finally, the undersigned **RECOMMENDS** that the attorney fee fund be established as soon as practicable and that settlement payments to plaintiffs as well as attorney fees to IRPAs and to the PSC members be disbursed upon establishment of the fund.

### C. Costs

In the instant case, the PSC is only authorized to receive reimbursement for reasonable and necessary expenses. In all cases in which the prevailing attorneys request cost awards, "[t]he PSC and its members undoubtedly must establish their entitlement to reimbursement." *In re San Juan Dupont Plaza Hotel Fire Litigation*, 111 F.3d 220, 228 (1997). Based on

information provided by the PSC, as of November 1999 the total expenses incurred were approximately $194,619.23. At this point, the final costs associated with the litigation have not been tabulated. However, the PSC has requested that 5% of the total fee award be set aside to cover costs. To date, we perceive no evidence of overreaching on the part of the PSC. And, like the First Circuit in *In re Thirteen Appeals*, *supra*, it is noted that "the district court initially proposed to limit PSC attorney fees and costs, combined to ten percent of the eventual common fund, *thus providing PSC members a substantial inducement to exert reasonable efforts to minimize PSC costs*" (emphasis supplied). Moreover, those IRPAs who participated at the hearings and those who attended a meeting at the PSC offices and were able to examine all records within the PSC's possession expressed they had no reason to doubt the PSC's claims or record-keeping methodology. The IRPAs have clearly stated they have no quarrel with the proposed 5% figure.

Thus, the 5% figure is appropriate at this time, with the understanding that an actual cost award will be made at a later date. Therefore, it is **RECOMMENDED** that 5% of the total fee award be set aside to cover costs, that an escrow account be established for same and that upon proper verification of all claims presented that disbursements be made as soon as practicable. It is further **RECOMMENDED** that any monies remaining after payment of all costs be proportionally distributed among the plaintiffs.

## IV.     Conclusion

For the foregoing reasons, the undersigned hereby **RECOMMENDS** that the PSC be entitled to attorney's fees funded by one-third (33.33%) of the privately agreed contingency fee contracts between each attorney and his or her client involved in this litigation. In addition, the

undersigned **RECOMMENDS** that 5% of the total fee award be set aside to cover the costs incurred by the PSC in litigating this case.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 504.3 of the Local Rules of Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of its receipt. Rule 510.1, Local Rules of Court; Fed. R. Civ. P. 72(b). Failure to timely file specific objections to the Report and Recommendation is a waiver of the right to review by the District Court. *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980). The parties are advised that review of a Magistrate-Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate-Judge. *Paterson-Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir. 1988).

**SO RECOMMENDED.**

At San Juan, Puerto Rico, this 31st day of August, 2001.

**AIDA M. DELGADO-COLON**
**U.S. Magistrate-Judge**

s/cs:to (115)
attys/pts
in ICMS
9/6/01